FILED

2013 Jun-21  AM 08:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **RICK HUDSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-12-S-2225-NE** |
| | ) | |
| **PENNSYLVANIA LIFE** | ) | |
| **INSURANCE COMPANY,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This action arises from the sale of a disability insurance policy to plaintiff, Rick Hudson, by defendant Susan R. Sellers, and the denial of plaintiff's claim for long-term benefits under the terms of the policy by defendant Pennsylvania Life Insurance Company ("Penn Life").[1]  Plaintiff commenced this action in the Circuit Court of Cullman County, Alabama.[2]  He asserted claims against defendant Sellers for negligent procurement, fraud, and misrepresentation,[3] and against defendant Penn Life for bad faith and breach of contract.[4]

Defendant removed this action to the Northern District of Alabama pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, based upon the parties' complete diversity of

---

[1] Doc. no. 1-1 (Complaint) ¶¶ 4-9.

[2] *See id.*

[3] *Id.* ¶¶ 16-21.

[4] *Id.* ¶¶ 10-15.

citizenship and the requisite amount in controversy.[5]  Accordingly, "state substantive law and federal procedural law" apply.  *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). Plaintiff then filed an amended complaint adopting the four claims asserted in his original complaint, and adding a fifth claim for "anticipatory breach of contract or repudiation" against defendant Penn Life.[6]

Plaintiff recently consented to the dismissal of his claims against defendant Susan R. Sellers without prejudice.[7]  Thus, only plaintiff's claims against defendant Penn Life remain pending.  That defendant is succeeded in interest by Union Bankers Insurance Company ("Union Bankers").[8]  This action is before the court on Union Bankers' motion for summary judgment, and plaintiff's motion to strike two exhibits filed in support of summary judgment.[9]  Upon consideration, this court will grant Union Bankers' summary judgment motion in part and deny the motion in part.  The court will deny plaintiff's motion to strike.

## I.  STANDARD OF REVIEW

---

[5] *Id.* ¶¶ 5-6.

[6] Doc. no. 8 (Amended Complaint) ¶¶ 23-24.

[7] *See* doc. no. 16 (Penn Life's Motion to Dismiss plaintiff's claims against defendant Susan R. Sellers for failure to timely effect service of the complaint in accordance with Federal Rule of Civil Procedure 4(m)); doc. no. 17 (Plaintiff's Response in support of the motion); doc. no. 18 (Order granting the motion).

[8] *See* doc. no. 15 (Motion for Summary Judgment).

[9] *See id.*; doc. no. 26 (Motion to Strike).

2

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration supplied).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> [However,] [t]he mere existence of *some* factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal citations omitted) (alterations and emphasis suppled).

## II.  SUMMARY OF FACTS

**A.    Penn Life Policy No. PA02305180**

Plaintiff, Rick Hudson, is a 56-year-old former drywall/sheet rock installer who applied for a disability insurance policy with defendant Pennsylvania Life Insurance Company ("Penn Life") on February 13, 2003.[10]  In response, defendant issued to plaintiff Policy No. PA02305180, which provides maximum lifetime disability benefits of $1,200 per month.[11]  The Policy was effective February 13, 2003.[12]

Policy No. PA02305180 is "an accident only policy," meaning that it covers "specified loss resulting from injury," and does not cover "loss from sickness."[13]  The term "injury" refers to an "accidental bodily injury sustained:  (1) directly and independently of disease or bodily infirmity, or any other causes; and (2) while th[e] Policy is in force."[14]

## B.    Plaintiff's Pre-Existing Medical Conditions

In 1990 and again in 1993, prior to applying for disability benefits with Penn Life in February of 2011, plaintiff underwent two surgeries on his cervical spine.[15] Plaintiff underwent a cervical discectomy and fusion at C5-6 on March 23, 1990, as

---

[10] Doc. no. 15-3 (Deposition of Rick Hudson), at 28; *see also* doc. no. 27-2 (Claim File), at 136 (discussing plaintiff's occupation).

[11] *Id.* at 26-28; doc. no. 15-4 (Policy), at 29-50.

[12] Doc. no. 15-4 (Policy), at 29-50.

[13] *Id.* at 29; *see also* doc. no. 15-3 (Deposition of Rick Hudson), at 28-29.

[14] Doc. no. 15-4 (Policy), at 38 (alteration supplied).

[15] Doc. no. 15-3 (Deposition of Rick Hudson), at 46-47, 64.

a result of a neck injury sustained in a motor vehicle accident.[16]  Plaintiff underwent a cervical discectomy at C6-7 and removal of osteophytes (*i.e.*, bone spurs) on April 7, 1993, after he was diagnosed with herniated nucleus pulposus at C6-7.[17]

An MRI of plaintiff's spine taken in December of 2003 revealed a defect at the L3-L4 level compatible with disc herniation, as well as degenerative disc disease and stenosis at L4-L5 and L5-S1.[18]  Plaintiff underwent back surgery to remove the disc herniation at L3-L4 on February 5, 2004.[19]  The medical records from the 2004 surgery also showed that plaintiff had a history of chronic neck, back, and upper extremity pain.[20]

Plaintiff began to complain of pain radiating down his legs in February and March of 2004.[21]  An x-ray taken of plaintiff's lumbar spine in March of 2004 revealed "extensive degenerative disc changes."[22]  An MRI taken of plaintiff's lumbar spine in April of 2004 showed "postoperative changes at L3-4 and degenerative disc at L4-5 and L5-S1," "a moderate degree of spinal stenosis at the L4-5 level," and "a

---

[16] *Id.* at 19:6-22; doc. no. 15-5 (Records of Dr. Robert Ward), at 721-22.

[17] Doc. no. 15-5 (Records of Dr. Robert Ward), at 721-22.

[18] Doc. no. 15-6 (Records of Dr. Robert L. Hash), at 989.

[19] Doc. no. 15-3 (Deposition of Rick Hudson), at 45; doc. no. 15-6 (Records of Dr. Robert L. Hash), at 993-95.

[20] Doc. no. 15-6 (Records of Dr. Robert L. Hash), at 989.

[21] *Id.* at 997; doc. no. 15-7 (Records of Dr. James Matter), at 740.

[22] Doc. no. 15-6 (Records of Dr. Robert L. Hash), at 997.

small recurrent disc herniation at L3-4."[23]  A July of 2004 x-ray showed "degenerative disc disease at L4-5 and L5-S1."[24]

Plaintiff complained of chronic back and neck pain from September of 2004 through November of 2005, as well as pain in his hands, wrists, right arm, and left leg.[25]  An MRI taken in December of 2005 revealed "multilevel degenerative disc disease focused at L3-L4, L4-L5, and L5-S1."[26]

## C.    Plaintiff's December 11, 2010 Accident

Plaintiff climbed onto the seat of a chair to clean the windows of his garage in preparation for the holidays on December 11, 2010.[27]  The chair gave way, and plaintiff fell down, striking his head on the wall and floor.[28]  He was the only witness to the accident.[29]

## D.    Plaintiff's Medical Treatment

Immediately after sustaining the fall, plaintiff allegedly experienced pain in his head and a burning sensation in his left arm and down his chest.[30]  Even so, he was

---

[23] *Id.* at 998-99.

[24] *Id.* at 999.

[25] Doc. no. 15-7 (Records of Dr. James Matter), at 741, 746-48, 765-66.

[26] *Id.* at 767-68).

[27] Doc. no. 15-3 (Deposition of Rick Hudson), at 29-30.

[28] *Id.* at 29-31.

[29] *Id.* at 32.

[30] *Id.* at 33.

able to pull himself up and attempted to "walk it off."[31]

Plaintiff did not seek immediate medical attention.[32]  Instead, he called Dr. James Matter, his primary care physician, two days later:  on December 13, 2010.[33] However, Dr. Matter was out of town, and plaintiff did not see him until January 4, 2011.[34]

Plaintiff was able to perform the duties of his job hanging drywall on the day before his fall.[35]  He did not return to work after the fall, allegedly because he was in too much pain to do so.[36]  Plaintiff testified during his deposition as follows:

> Q.    When you say that you didn't return to work, did you attempt to do a drywall job and realize that you couldn't, or did you just make up in your mind that it wasn't good for you to work at that time?
>
> A.    Yeah, it was just painful.  It was just pain.
>
> Q.    So you didn't actually go on a job and attempt to do it?
>
> A.    No.[37]

An x-ray taken on January 12, 2011 revealed "marked degenerative change at

---

[31] *Id.* at 30-31.

[32] *Id.* at 32.

[33] Doc. no. 15-3 (Deposition of Rick Hudson), at 34.

[34] Doc. no. 15-3 (Deposition of Rick Hudson), at 34-36; doc. no. 15-7 (Records of Dr. James Matter), at 781.

[35] Doc. no. 15-3 (Deposition of Rick Hudson), at 37-38.

[36] *Id.*

[37] *Id.* at 38-39.

C6-C7 with loss of height and end plate sclerosis.  Lesser degenerative change [was] noted at the remaining visualized levels."[38]  The x-ray showed that plaintiff suffered from cervical spondylosis with "[n]o acute disease."[39]

A CT scan taken of plaintiff's cervical spine on January 28, 2011 revealed a mild disc bulge and osteophyte complex (*i.e.*, bone spur) and stenosis at C2-C3.[40]  The CT scan also showed mild to moderate disc degeneration with a bone spur and mild stenosis at C3-C4, C4-C5, and C6-C7.[41]  The radiologist who performed the x-ray noted the fusion at C6-C7 and mild to moderate disc degeneration at C7-T1.[42]

An MRI taken of plaintiff's cervical and lumbar spine on February 21, 2011 revealed that plaintiff suffered from cervical spondylosis, postoperative change, and multilevel canal compromise.[43]  The physician who performed the MRI observed "a minimal broadbased posterior protrusion with effacement of the anterior thecal sac" (*i.e.*, a herniated disc) and degenerative disc disease at C4-C5.[44]

After reviewing plaintiff's MRI results, Dr. Robert Ward, an orthopedic

---

[38] Doc. no. 15-7 (Records of Dr. James Matter), at 786 (alteration supplied).

[39] *Id.*; *see also id.* at 00794 (noting that the x-ray revealed "severe *degenerative* [change at] C6-C7") (emphasis and alteration supplied).

[40] Doc. no. 15-7 (Records of Dr. James Matter), at 798.

[41] *Id.*

[42] *Id.*

[43] Doc. no. 15-5 (Records of Dr. Robert Ward), at 647, 655-56.

[44] *Id.* at 655-56.

surgeon, recommended surgical fusion at C4-C5, and performed the fusion on March 2, 2011.[45]

## E.    Plaintiff's Social Security Disability Insurance Claim

Plaintiff submitted a claim for disability benefits to the Social Security Administration on January 5, 2011, *prior to* the existence of any objective medical evidence to show that he had a herniated disc.[46]  In the section seeking "all physical or mental conditions . . . that limit [plaintiff's] ability to work," he listed the following:  "2 fusions in neck"; "back problems and 1 surgery"; "ulcerated colitis"; "stroke, one side of brain is not working"; "sleep apnea"; "hbp" (*i.e.*, high blood pressure); "copd" (*i.e.*, chronic obstructive pulmonary disease); "high cholesterol"; and "depression."[47]

## F.    Plaintiff's Penn Life Disability Insurance Claim

Plaintiff submitted a claim for disability benefits to Union Bankers Insurance Company ("Union Bankers") (the successor in interest to defendant Penn Life) on February 4, 2011.[48]  Plaintiff's "Policyholder's Claim Report" disclosed his previous

---

[45] Doc. no. 15-3 (Deposition of Rick Hudson), at 54-55; doc. no. 15-5 (Records of Dr. Robert Ward), at 665-67; doc. no. 27-2 (Claim File), at 130-34.

[46] Doc. no. 15-18 (SSDI Records), at 1262.

[47] *Id.* at 1010.

[48] Doc. no. 15-3 (Deposition of Rick Hudson), at 64; doc. no. 27-1 (Claim File), at 1-4.

spinal surgeries.[49]   Four days later, plaintiff submitted an "Attending Physician's Report" from Dr. Robert Ward, his orthopedic surgeon.[50]   The Report stated that plaintiff's condition was affected by multilevel degenerative disc disease, injuries from a motor vehicle accident, and surgeries on his neck and back.[51]

Union Bankers entrusts all decisions on disability benefits claims by Penn Life policyholders to CHCS Services, Inc., a third-party administrator.[52]   In turn, CHCS Services assigns all Penn Life claims that arise in the State of Alabama to a single claims adjuster, Melinda Riley.[53]   Training on handling such claims is provided by Dan Howe, the vice president and assistant general counsel of Universal American Corporation (the parent company of Union Bankers), and Michael Orr, an employee of either Penn Life or another third-party administrator.[54]

Adjuster Melinda Riley interviewed plaintiff by telephone on February 23, 2011.[55]   In her report of that interview, Riley noted that plaintiff "has fusions and screws in his neck," and that he "had back surgery in 2004."[56]   She also began the

---

[49] Doc. no. 27-1 (Claim File), at 2.

[50] *Id.* at 5-6.

[51] *Id.* at 5.

[52] Doc. no. 15-14 (Deposition of Anita Neptune), at 7-8.

[53] *Id.* at 32.

[54] Doc. no. 15-13 (Deposition of Melinda Riley), at 9-10; doc. no. 15-14 (Deposition of Anita Neptune), at 42-44.

[55] Doc. no. 15-13 (Deposition of Melinda Riley), at 25; doc. no. 27-1 (Claim File), at 7.

[56] Doc. no. 27-1 (Claim File), at 7.

process of obtaining plaintiff's complete medical records.

After completing a "Preliminary Review" of plaintiff's claim, Union Bankers decided to pay him one month's worth of benefits on March 3, 2011, and reserve the right to make a final determination after reviewing his medical history, and based on the reasonable recovery period for his injuries.[57]

Accordingly, Union Bankers initially paid plaintiff $1,920, an amount reflecting total disability benefits of $1,200 per month for the period of December 11, 2010 through January 31, 2011.[58] Union Bankers sent plaintiff two additional payments of $1,200 each on April 6 and April 27, 2011, covering the two-month period of February 1 through March 31, 2011.[59]

## G.   The First Benefits Decision

Plaintiff later sent Union Bankers an "Attending Physician's Supplemental Report," dated March 28, 2011, and authored by Dr. Robert Ward, his orthopedic surgeon.[60] The Report stated that plaintiff suffered from "cervical pain" as a result of the cervical fusion performed on March 2, 2011.[61] It also stated that plaintiff would

---

[57] Doc. no. 15-9 (Advisor Opinion & Management Review), at 9; doc. no. 27-1 (Claim File), at 10.

[58] Doc. no. 15-3 (Deposition of Rick Hudson), at 65-66; *see also* doc. no. 15-10 (Explanation of Benefits), at 525.

[59] Doc. no. 15-3 (Deposition of Rick Hudson), at 66-67; *see also* doc. no. 15-10 (Explanation of Benefits), at 531, 536.

[60] Doc. no. 15-12 (Attending Physicians' Statements), at 66.

[61] *Id.*

be "able to resume full work" on August 1, 2011.[62]

Adjuster Melinda Riley referred plaintiff's disability claim to Dr. John David Nye on May 27, 2011.[63]  Dr. Nye was a board certified physician who served as Medical Director of CHCS Services and practiced in the areas of trauma and bariatric surgery.[64]  The Medical Director completed his report on June 3, 2011, and concluded as follows:

> Mr. Hudson is a 56-year-old drywall/sheet rock installer, who [states] he hurt his neck and back on 12/11/10 when he fell off a chair in his garage.  [He] first received medical treatment on 01/4/2010, by Dr. Matter.  He indicates he previously had surgery at C5-C6, in 1990, and in 1993 at C6-C7.  In addition to the cervical spine surgery, Mr. Hudson had previous back surgery in 2004.  His diagnosis at that time was multi-level degenerative disc disease, a motor vehicle accident, and injury.

> On 2/17/11, Mr. Hudson was seen by Dr. Ward of Coleman Spine Institute in Alabama.  The neurological examination was basically normal.  An MRI of [his] cervical spine and a CT myelogram was ordered.  **X-rays, performed on 01/14/2011, of the cervical spine demonstrated the fusion from previous surgery [at] C5 and C6 bodies**.  There [were] **marked degenerative changes at C6-C7 [with] a loss of height** in the bodies and **end plate sclerosis**.  There [were] also some **degenerative changes noted in the remaining . . . levels**.

> **A CT scan of the cervical spine, performed 01/28/2011, demonstrated moderately severe disc degeneration and osteophyte complexes throughout from C2 to T1.**  The C5-C6 had a complete fusion.  There [were] still some osteophyte[] complexes in the left [latter]

---

[62] *Id.*

[63] Doc. no. 27-2 (Claim File), at 136.

[64] Doc. no. 15-13 (Deposition of Melinda Riley), at 32; doc. no. 15-14 (Deposition of Anita Neptune), at 82-83.

recess area.

[A m]yelogram, performed on Mr. Hudson on 1/20/28/2011 [sic] was totally unremarkable with no spinal cord[] stenosis identified.

Mr. Hudson apparently underwent a C4-C5 spinal fusion with hardware.

On 02/21/2011, an MRI of the [lumbar] spine demonstrated moderate degenerative changes throughout, with [spondylosis] and no herniation[] and no other findings.

There is clearly documented history of the previous cervical neck surgery twice, . . . in addition to lumbar surgery.  Although this fall may have exacerbated previous surgical sites and medical conditions, the MRI report and CT [scans] of the cervical spine, demonstrate, beyond any reasonable doubt, the fact that there is significant degenerative disc disease present.  Mr. Hudson was operated on for symptoms related to degenerative disc disease of the neck.  This degenerative disease may have and an acute exacerbation from the fall but certainly was not caused by the fall.  Mr. Hudson should have reached . . . maximum medical improvement within a period of eight to 12 weeks after this fall.

A typical [time frame] to reach maximum medical improvement (MMI) after a single level surgical fusion with previous fusions above and below this, plus hardware, is in the range of eight to 12 weeks, and sometimes [four] months.

The lumbar MRI did no demonstrate any surgical pathology but did demonstrate degenerative disc disease throughout.

It is reasonable to allow eight weeks to 12 weeks to reach (MMI) maximum medical improvement after the fall, although the majority of the problems are due to degenerative disc disease that was previously present plus the prior two single level cervical spinal fusion[]s,

13

performed in 1990 and 1993.[65]

Dr. Nye's report incorrectly stated that an MRI taken of plaintiff's cervical and lumbar spine on February 21, 2011 revealed "no herniation[]."[66]  In fact, the physician who performed the MRI observed "a minimal broadbased posterior protrusion with effacement of the anterior thecal sac" (*i.e.*, a herniated disc) and degenerative disc disease at C4-C5.[67]

Union Bankers sent plaintiff a letter regarding his disability benefits claim on June 8, 2011.[68]  The letter stated that,

> After a review of the all information received to date, it appears that this occurrence caused an exacerbation of your pre-dated medical conditions. Based on this, it has been determined that you would be entitled to benefits for the reasonable recovery period for the acute injuries you sustained.
>
> We have previously provided benefits on your claim from December 10, 2010 through March 31, 2011.  At this time, we would like to advise you that your claim has been closed as additional benefits are not payable.[69]

## H.   The Second Benefits Decision

After receiving Union Bankers' letter, plaintiff submitted new "Attending

---

[65] Doc. no. 27-2 (Claim File), at 136 (emphasis in original) (alterations supplied to correct spelling and grammatical errors).

[66] *Id.* (alteration supplied).

[67] Doc. no. 15-5 (Records of Dr. Robert Ward), at 655-56.

[68] Doc. no. 15-11 (June 8, 2011 Letter), at 137.

[69] *Id.*

14

Physicians' Statements of Disability" from Dr. James Matter, his primary care physician, and Dr. Robert Ward, his orthopedic surgeon.[70]  The physicians reviewed an MRI taken of plaintiff's cervical spine in February of 2011, and rendered a diagnosis of cervical radiculpathy and spinal stenosis.[71]  The Statements contained a significant contradiction with Dr. Ward's Report dated March 28, 2011, which stated that plaintiff would be "able to resume full work" by August 1, 2011.[72]  Both Statements also indicated that plaintiff was totally disabled from any occupation, and that he would not be able to return to work.[73]

More specifically, Dr. Matter noted that plaintiff "was working and active until the time of [his] injury" on December 11, 2010.[74]  He concluded that the accident "caus[ed plaintiff's] cervical radiculopathy and spinal stenosis," and "rendered him unable to work."[75]  Dr. Ward observed that, while plaintiff had had "previous neck surgeries back in 1990 and 1993," he had "functioned well for approximately 17 years," and was "working and doing well up until his injury."[76]  Like Dr. Matter, Dr. Ward concluded that the fall "caused [plaintiff's] current disability and prevent[ed]

---

[70] Doc. no. 15-12 (Attending Physicians' Statements), at 183-84.

[71] *Id.*

[72] Doc. no. 15-12 (Attending Physicians' Statements), at 66.

[73] *Id.*

[74] Doc. no. 27-1 (Claim File), at 56 (alteration supplied).

[75] *Id.* (alteration supplied).

[76] *Id.* at 55.

15

him from returning to work."[77]   He also opined that plaintiff would remain on "permanent total disability."[78]

Union Bankers provided Dr. Nye with a copy of Dr. Ward's "Attending Physician's Statement of Disability."[79]   It also gave Dr. Nye a "Referral to Medical Director" form stating:   "Please call the treating physician and discuss insured occurrence of 12-11-10.  The physician has sent in new information."[80]  Even so, Dr. Nye did not "discuss" the accident with either of plaintiff's treating physicians.[81]  By way of explanation, CHCS Disability Claims Advisor Anita Neptune testified that: "we use Dr. Nye as a tool.  He doesn't follow all of our suggestions and we don't follow all of his suggestions.  We go to him just for the science of the human body."[82]

In any event, Union Bankers contacted plaintiff's physicians and requested plaintiff's updated medical records to assist in Dr. Nye's reassessment of the claim.[83] Dr. Nye completed his second medical review on July 21, 2011, and concluded as follows:

---

[77] *Id.* (alterations supplied).

[78] *Id.*

[79] Doc. no. 15-13 (Deposition of Melinda Riley), at 37, 39; doc. no. 27-2 (Claim File), at 140; doc. no. 27-3 (Claim File), at 141.

[80] Doc. no. 27-3 (Claim File), at 141.

[81] Doc. no. 15-13 (Deposition of Melinda Riley), at 44-45; doc. no. 15-14 (Deposition of Anita Neptune), at 114-16.

[82] Doc. no. 15-14 (Deposition of Anita Neptune), at 130.

[83] Doc. no. 27-3 (Claim File), at 144.

Mr. Hudson indicated he hurt his neck on 12/11/2010, when he fell off of a chair in his garage, but he **did not seek medical treatment for three weeks**. There is a **prior history of the surgery on his neck at two different time frames**, one in 1990, and [one] in 1993. The surgery in [1990] was reportedly at C5-C6 and at C6-C7 in 1993. The **x-rays performed on 01/14/2011** of the cervical spine demonstrated **marked degenerative** changes and previous surgery with fusion. A **CT scan of the cervical spine, performed 01/28/2011 demonstrate[s] the previous surgery and severe degenerative disc disease with [osteophyte]** formation and **disc degeneration**. There was no evidence of dislocation or fracture. A **myelogram performed 01/20/2011 demonstrated no evidence of spinal canal stenosis**.

Mr. Hudson underwent a C4-C5 spinal fusion by Dr. Ward.

It would be best to obtain an independent medical evaluation by a neurosurgeon concerning the neck issue.

It is obvious, in reading the CT scan and myelogram reports that there was no evidence of spinal stenosis of significance. The myelogram confirmed this. There is diffuse cervical spine arthritis, documented, plus documented previous cervical neck surgery — twice.

Although there may be a disability or impairment due to the cervical neck problem, that **cervical neck problem has been an issue for at least 15 years, with two previous surgeries**. There is C.T., MRI, and myelogram documentation of the severe degenerative changes and no acute fractures or [ruptured discs]. Therefore, it is clear, that although the **fall may have exacerbated a previously existing condition, that condition — degenerative disc disease of the cervical spine — is documented beyond any reason to exist prior to the fall**. Additionally, the fall did not produce any fractures or dislocations and would be considered at most, [an] exacerbation of previously documented prior existing degenerative conditions.

Therefore, again an independent medical evaluation by a neural surgeon (not in Coleman[,] Alabama, but in Birmingham or Mobile)

would be indicated, with a request to determine what damages the fall actually produced.[84]

Union Bankers did not act on the recommendation that it "obtain an independent medical evaluation by a neurosurgeon concerning the neck issue,"[85] allegedly because "[t]here wasn't a question that . . . needed answering that required an independent medical evaluation."[86]

Union Bankers sent plaintiff a letter regarding its reevaluation of his disability benefits claim on November 10, 2011.[87]  The letter stated that,

> Your policy defines Injury as "accidental bodily injury sustained: 1) directly and independently of disease or bodily infirmity, or any other causes; and 2) while this policy is in force."
>
> While reviewing your medical records, we noticed that in addition to your acute injuries sustained to your neck, specifically the disc herniation to C4-C5 as shown in your February 21, 2011 MRI, . . . there is degenerative disc disease throughout your cervical spine as well as cervical spondylosis.  These are considered sickness conditions and are not covered by your accident only policy.
>
> For these reasons, it has been determined that you are entitled to additional benefits for the reasonable recovery period for the aforementioned acute injuries you sustained, post surgical intervention. Shortly, you will be receiving a check that represents a final payment for

---

[84] Doc. no. 27-3 (Claim File), at 144 (emphasis in original) (alterations supplied to correct spelling and grammatical errors).

[85] *Id.* (alteration supplied); *see also* doc. no. 15-14 (Deposition of Anita Neptune), at 132-33; doc. no. 15-15 (Nov. 10, 2011 Letter), at 203.

[86] Doc. no. 15-14 (Deposition of Anita Neptune), at 132 (alteration supplied); *see also id.* at 146-47.

[87] Doc. no. 27-3 (Claim File), at 203.

18

your total disability benefit as well as your surgical benefit for your loss.[88]

In accordance with the representations in the November 10, 2011 letter, Union Bankers paid plaintiff a total of $4,650 on December 1, 2011, reflecting surgical benefits of $1,050 and total disability benefits of $1,200 per month for the period of April through June of 2011.[89]

## I.    Plaintiff's Complaint to the Alabama Department of Insurance

Plaintiff contacted the Alabama Department of Insurance regarding his claim for disability benefits *prior to* the conclusion of Union Bankers' reexamination of the claim.[90]  In response to a letter of inquiry from the Department dated October 7, 2011, Union Bankers reassessed plaintiff's waiver of premium benefit under the Policy, and refunded to plaintiff premium payments in the amount of $593.11 on December 23, 2011, reflecting the period of January through June of 2011.[91]

## III.  MOTION TO STRIKE

Plaintiff seeks to exclude two items of evidence in support of Union Bankers' motion for summary judgment: *i.e.*, an Internet article entitled "Cervical Spondylosis"

---

[88] *Id.*

[89] Doc. no. 15-3 (Deposition of Rick Hudson), at 67-68; doc. no. 15-10 (Explanation of Benefits), at 542.

[90] *See* doc. no. 15-16 (Letters to ADOI).

[91] *See* doc. no. 15-17 (Disbursement Check), at 1296.

(document number 15-8); and a report from defendant's expert witness, Dr. Steven R. Nichols (document number 15-19).[92]

A.    "Cervical Spondylosis" Article

Union Bankers observes in a footnote that, according to the National Institute of Health,

> Cervical spondylosis is a disorder in which there is abnormal wear on the cartilage and bones of the neck (cervical vertebrae). It is a common cause of chronic neck pain.
>
> Cervical spondylosis is caused by chronic wear on the cervical spine. This includes the disks or cushions between the neck vertebrae and the joints between the bones of the cervical spine. There may be abnormal growths or "spurs" on the bones of the spine (vertebrae).
>
> People who are very active at work or in sports may be more likely to have them.
>
> The major risk factor is aging.[93]

The motion quotes an article entitled "Cervical Spondylosis," which is available on the MedlinePlus website cited in the following footnote.[94]   MedlinePlus is produced by the U.S. National Library of Medicine, a division of the National Institute of Health, which is part of the United States Department of Health and Human

---

[92] *See* doc. no. 26 (Motion to Strike).

[93] Doc. no. 15-1 (Brief in Support of Motion for Summary Judgment), at 7 n.2 (emphasis omitted) (quoting doc. no. 15-8 ("Cervical Spondylosis" Article).

[94] *Id.*  *See* http://www.nlm.nih.gov/medlineplus/ency/article/.

Services.[95]  The National Institute of Health is the nation's largest medical research agency.[96]

Plaintiff has filed a motion to strike the "Cervical Spondylosis" article on the grounds that "[t]he article is classic hearsay."[97]  Even if the article is hearsay, this court may take judicial notice of a fact in the article, *if* that fact "is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

"In the absence of expert testimony, several courts have used judicial notice to . . . better critique and understand . . . medical representations."  *Mosley v. General Revenue Corp. (In re Mosley)*, 330 B.R. 832, 844-45 (Bankr. N.D. Ga. 2005) (alteration supplied).  *See Wangenstein v. Equifax, Inc.*, 191 F. App'x 905, 917 (11th Cir. 2006) (citing Dorland's Illustrated Medical Dictionary 1564 (28th ed. 1994) and 295 J. Am. Med. Ass'n 2320 (May 17, 2006) for definitions and symptoms of cervical spondylosis, myelopathy, and migraines); *Krohmer-Burkett v. Hartford Life and Accident Insurance Co.*, No. 803CV873T30MAP, 2005 WL 2614503, *2 n.6 (M.D. Fla. Oct. 14, 2005) (taking judicial notice of the Merriam Webster Medical

---

[95] Doc. no. 30 (Response to Motion to Strike), at 7

[96] *Id.*

[97] Doc. no. 26 (Motion to Strike), at 2 (alteration supplied).

Dictionary's website's definition of "stenosis").[98]

Further, multiple courts have taken judicial notice of websites "whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). *See Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (holding that a district court could take judicial notice of a state agency website); *In re Everglades Island Boat Tours, LLC*, 484 F. Supp. 2d 1259, 1261 (M.D. Fla. 2007) (taking judicial notice of a state agency website); *Mitchell v. Nix*, CV 105-2349, 2007 WL 779067, *4 (N.D. Ga. Mar. 8, 2007) (taking judicial notice of a state agency website); *Vlahos v. Schroeffel*, CV No. 02-CV-019DLI, 2006 WL 544444, *5 (E.D. N.Y. Mar. 6, 2006) (taking judicial notice of a university hospital's website); *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1084 (C.D. Cal. 2001) (taking judicial notice of a defendant business's website).

Indeed, this court recently took judicial notice of an exhibit containing definitions and descriptions of a plaintiff's medical conditions in an action challenging the denial of a disability claim. *See Garmon v. Liberty Life Assurance Co. of Boston*, 385 F. Supp. 2d 1184, 1203-1214 (N.D. Ala. 2004). This court reasoned that: "The

---

[98] *See also Pobiner v. Education Credit Management Corp. (In re Pobiner)*, 309 B.R. 405, 419-20 (Bankr. E.D.N.Y. 2004) (taking judicial notice of the career prospects of persons suffering from Attention Deficit Hyperactivity Disorder as described in a National Institute of Mental Health publication); *Green v. Sallie Mae (In re Green)*, 238 B.R. 727, 735-36 (Bankr. S.D. Ohio 1999) (taking judicial notice of the career prospects of persons suffering from bipolar disorder); *Doherty v. United Student Aid Funds, Inc. (In re Doherty)*, 219 B.R. 665, 670 (Bankr. W.D. N.Y. 1998) (reviewing medical publications and treatises on bipolar disorder and taking judicial notice of the "most probable near-future" for persons suffering from the disorder).

Exhibit bears the imprimatur of both the National Institute of Arthritis and Musculoskeletal and Skin Diseases and [as here,] the National Institutes of Health Department of Health and Human Services. The facts recited therein are not subject to reasonable dispute because the sources cannot be reasonably questioned." *Id.* (alterations supplied). (citing Fed. R. Evid. 201 and the notes of the Advisory Committee thereunder).

Like the exhibit in *Garmon*, the exhibit in this case contains a description of a medical condition from a website maintained by the National Institute of Health: a "source [that] cannot be reasonably questioned." *Id.* (Alteration supplied). Accordingly, this court will deny plaintiff's motion to strike the exhibit.

**B.    Dr. Nichols's Expert Witness Report**

Union Bankers has submitted an expert witness report from Dr. Steven R. Nichols, a board certified orthopedic surgeon.[99] Dr. Nichols opined that plaintiff

> has almost a twenty-year history of chronic neck and low back pain with associated disability. According to the medical records, this has required intermittent and ongoing pain management in some form or fashion.
>
> It is my opinion that falling out of the chair in December 2010 most likely was not a significant factor leading up to his surgery in March 2010. Also this injury most likely was not a significant factor in his subsequent complaints of disability since according to the preoperative radiology reports there was evidence of significant multilevel degenerative disc changes throughout the cervical spine with

---

[99] Doc. no. 15-19 (Expert Report of Dr. Steven R. Nichols).

multilevel disk/osteophyte complexes and associated stenosis not just at C4-5.

. . . .

In summary, based on my experience as well as the orthopedic and spine literature, it is my opinion that the patient's ongoing cervical spondylolysis along with his adjacent segment disease at C4-5 led to his surgical fusion at C4-5 in March 2011. While falling out of a chair may very well have caused a temporary increase in his symptoms; all in all I do not feel that this significantly altered his ongoing disease process.[100]

Plaintiff has filed a motion to strike Dr. Nichols's expert witness report on two grounds.[101]  First, plaintiff argues that the report is "inadmissible hearsay" because it is "an unsworn memorandum."[102]  Second, he asserts that the report is "irrelevant to the resolution of the pending summary judgment motion" because it "is dated March 22, 2013 and was unavailable at the time Defendant reviewed the claim and denied it the first time on June 8, 2011 and the second time on November 10, 2011."[103]

Federal Rule of Civil Procedure 56(e)(1) states that "[i]f a party fails to properly support an assertion of fact[,] . . . the court may give an opportunity to properly support . . . the fact."  Fed. R. Civ. P. 56(e)(1) (alterations supplied).  Consistently with Rule 56, a "number of district courts have permitted affidavits to cure previously

---

[100] *Id.* at PennLife/Hudson 1292-93.

[101] *See* doc. no. 26 (Motion to Strike).

[102] *Id.* at 2.

[103] *Id.* at 3-4.

unsworn materials." *DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576

F.3d 820, 826 (8th Cir. 2009).[104]

Union Bankers addressed plaintiff's argument that Dr. Nichols's report is

hearsay by filing a declaration from Dr. Nichols affirming his report under penalty of

perjury.[105]  Union Bankers's use of Dr. Nichols's declaration to cure the defect in his

previously unsworn report will not prejudice plaintiff because defendant provided

plaintiff with a copy of the report on March 22, 2013, more than two months before

plaintiff responded to the motion for summary judgment.[106]  Accordingly, plaintiff's

argument that the report is hearsay is now moot.

---

[104] *See also Medtronic Xomed, Inc. v. Gyrus ENT LLC*, 440 F. Supp. 2d 1300, 1310 n.6 (M.D. Fla. 2006) (holding that an expert report was properly before the court in considering motions for summary judgment because the expert had identified his unsworn report during his deposition); *Volterra Semiconductor Corp. v. Primarion, Inc.*, 796 F. Supp. 2d 1025, 1038-39 (N.D. Cal. 2011) (overruling an objection to unsworn expert reports where the proponent provided a sworn declaration from the expert with the challenged reports attached); *Straus v. DVC Worldwide, Inc.*, 484 F. Supp. 2d 620, 634 (S.D. Tex. 2007) ("While filing [an] unsworn expert report did not constitute admissible summary judgment evidence, see Fed. R. Civ. P. 56(e), that deficiency was cured by filing the sworn declaration.") (alteration supplied); *Maytag Corp. v. Electrolux Home Products, Inc.*, 448 F. Supp. 2d 1034, 1064 (N.D. Iowa 2006) ("This court concludes that subsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment."); *Gache v. Town of Harrison*, 813 F. Supp. 1037, 1052 (S.D. N.Y. 1993) ("To the extent defendants seek to strike the submissions . . . as unsworn reports by experts, the issues have been mooted by plaintiff's submission of sworn declarations by each of these individuals swearing to the veracity of their statements.").

[105] *See* doc. no. 30-1 (Declaration of Dr. Steven R. Nichols).

[106] Doc. no. 30 (Response to Motion to Strike), at 4.  *See, e.g., Gache*, 813 F. Supp. at 1052 ("No prejudice results to defendants since the sworn declarations have been submitted by plaintiff well in advance of trial and defendants were already fully cognizant of the opinions of plaintiff's experts.").

Plaintiff also contends that the report is "irrelevant" because it was not written until after the review of his disability benefits claim was complete.[107]  He observes that, "under longstanding Alabama law, in the area of bad faith, 'information received by the insurer *after* the date of the denial is irrelevant to the determination of whether the insurer denied at that date in bad faith.'"  *Union Bankers Fire & Casualty Co. v. Slade*, 747 So.2d 293, 317 (Ala. 1999) (emphasis in original) (quoting *Insurance Co. of North America v. Citizensbank of Thomasville*, 491 So.2d 880, 883 (Ala.1986)).[108]

However, plaintiff's claims against Penn Life are not limited to bad faith. Plaintiff asserts three claims against defendant:  *i.e.*, bad faith; breach of contract; and "anticipatory breach of contract or repudiation."[109]  As discussed in greater detail below, the analysis of a "normal" bad faith claim focuses on whether the insurer had a reasonably legitimate basis for denying the claim, and the analysis of an "abnormal" bad faith claim focuses on whether the insurer properly investigated the claim before issuing the denial.  *See Pyun v. Paul Revere Life Insurance Co.*, 768 F. Supp. 2d 1157, 1169-70 (N.D. Ala. 2011); *Singleton v. State Farm Fire & Casualty Co.*, 928 So. 2d 280, 283 (Ala. 2005).  Therefore, an expert report written after the date of the denial is not relevant to the existence of either type of bad faith.  In contrast, the analysis of

---

[107] Doc. no. 26 (Motion to Strike)*, at 3-4.

[108] *Id.*

[109] Doc. no. 1-1 (Complaint) ¶¶ 10-15; doc. no. 8 (Amended Complaint) ¶¶ 23-24.

a breach of contract claim asks simply whether the insurer was required to pay the claim under the terms of the policy.  *See generally Pyun*, 768 F. Supp. 2d at 1169.  Dr. Nichols's report addresses the issue of whether plaintiff's injuries were caused by various preexisting conditions and, thus, whether they were covered under the policy. Accordingly, his report is relevant to the existence of a duty to pay.

For all of those reasons, this court will deny plaintiff's motion to strike that exhibit.

## IV.  MOTION FOR SUMMARY JUDGMENT

### A.      Breach of Contract

Plaintiff asserts that defendant committed a breach of contract by refusing to pay his claim for total disability benefits.[110]  In the context of an insurance claim under Alabama law, "the insured bears the initial burden of establishing insurance coverage by demonstrating that a claim falls within the insurance policy."  *Pyun v. Paul Revere Life Insurance Co.*, 768 F. Supp. 2d 1157, 1169 (N.D. Ala. 2011) (citing *Shalimar Contractors, Inc. v. American States Insurance Co.*, 975 F. Supp. 1450, 1454 (S.D. Ala. 1997); *Colonial Life & Accident Insurance Co. v. Collins*, 280 Ala. 373, 194 So. 2d 532, 535 (Ala. 1967)).

The policy issued by Penn Life is "an accident only policy" that pays benefits

---

[110] Doc. no. 1-1 (Complaint) ¶¶ 14-15.

"for specified loss resulting from injury," and does not pay benefits "for loss from sickness."[111]  The term "injury" refers to an "accidental bodily injury sustained:  (1) directly and independently of disease or bodily infirmity, or any other causes; and (2) while th[e] Policy is in force."[112]  Thus, in order to establish his claim for breach of contract, plaintiff must prove that his alleged disability was caused directly by "injuries" sustained in his fall on December 11, 2010, and independently of "sicknesses," such as his preexisting conditions of cervical spondylosis and degenerative disc disease.

Union Bankers relies on *Black-Gammons v. Zurich American Insurance Co.*, No. CIVA104CV819MHTWO, 2006 WL 47503 (M.D. Ala. Jan. 9, 2006), an unpublished decision from a district court in Alabama granting an insurer's motion for summary judgment on a claim for breach of contract brought by a plaintiff suffering from preexisting conditions.  However, unlike the plaintiff in this case, the plaintiff in *Black-Gammons* did not argue "that the injuries she sustained during the accident are solely responsible for her herniated discs," or even "that the herniated discs are the sole cause of her inability to work.  *Id.* at *3.

Here, both of plaintiff's treating physicians have attributed his disability to the

---

[111] Doc. no. 15-4 (Policy), at 29; *see also* doc. no. 15-3 (Deposition of Rick Hudson), at 28-29.

[112] Doc. no. 15-4 (Policy), at 38 (alteration supplied).

accident. Dr. James Matter, his primary care physician, noted that plaintiff "was working and active until the time of [his] injury."[113] He concluded that the fall "caus[ed plaintiff's] cervical radiculopathy and spinal stenosis," and "rendered him unable to work."[114] Dr. Robert Ward, plaintiff's orthopedic surgeon, observed that, while plaintiff had had "previous neck surgeries back in 1990 and 1993," he had "functioned well for approximately 17 years," and was "working and doing well up until his injury."[115] Like Dr. Matter, Dr. Ward concluded that the accident "caused [plaintiff's] current disability and prevent[ed] him from returning to work."[116]

Even so, CHCS Medical Director Dr. John David Nye reviewed plaintiff's medical records, and reached the opposite result. Dr. Nye decided that, "although the **fall may have exacerbated a previously existing condition, that condition — degenerative disc disease of the cervical spine — is documented beyond any reason to exist prior to the fall**."[117] Dr. Nye also determined that the accident "did not produce any fractures or dislocations and would be considered at most, [an] exacerbation of previously documented prior existing degenerative conditions."[118]

---

[113] Doc. no. 27-1 (Claim File), at 56 (alteration supplied).

[114] *Id.* (alteration supplied).

[115] *Id.* at 55.

[116] *Id.* (alterations supplied).

[117] Doc. no. 27-3 (Claim File), at 144 (emphasis in original).

[118] *Id.* (alteration supplied).

Likewise, Union Bankers' expert witness, Dr. Steven R. Nichols, determined that plaintiff's

> ongoing cervical spondylolysis along with his adjacent segment disease at C4-5 led to his surgical fusion at C4-5 in March 2011. While falling out of a chair may very well have caused a temporary increase in his symptoms; all in all I do not feel that this significantly altered his ongoing disease process.[119]

Viewing the evidence in the light most favorable to the nonmoving party (in this case, plaintiff), the difference of opinion between plaintiff's treating physicians, on one hand, and CHCS's Medical Director and defendant's expert witness, on the other, is sufficient to create an issue of fact on whether plaintiff's disability was caused directly by "injuries" sustained in his fall on December 11, 2010, or whether it was instead caused by "sicknesses," such as preexisting cervical spondylosis and degenerative disc disease.  Accordingly, this court will deny the motion for summary judgment on plaintiff's breach of contract claim.

**B.     Bad Faith**

Plaintiff asserts that defendant acted in bad faith by denying his disability benefits claim.[120]

**1.     "Normal" bad faith**

In order to recover on a "normal" bad-faith claim under Alabama

---

[119] Doc. no. 15-19 (Expert Report of Dr. Steven R. Nichols), at PennLife/Hudson 1292-93.
[120] Doc. no. 1-1 (Complaint) ¶¶ 11-12.

law, a plaintiff must prove (1) an insurance contract between the parties and a breach thereof by the defendants; (2) an intentional refusal to pay the insured's claim; (3) the absence of any reasonably legitimate or arguable reason for that refusal (*i.e.*, the absence of a debatable reason); (4) the insurer's actual knowledge of the absence of any legitimate or arguable reason; and (5) if the intentional failure to determine the existence of a wrongful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is an legitimate or arguable reason to refuse to pay the claim. *Smith v. MBL Life Assurance Corp.*, 589 So. 2d 691, 697 (Ala. 1991). As the Alabama Supreme Court later explained:

> The Plaintiff asserting a bad-faith claim bears a heavy burden. To establish a *prima facie* case of bad-faith refusal to pay an insurance claim, a plaintiff must show that the insurer's decision not to pay was without a[] ground for dispute; in other words, the plaintiff must demonstrate that the insurer had no legal or factual defense to the claim. The insured must eliminate any arguable reason propounded by the insurer for refusing to pay the claim. A finding of bad faith based upon rejection of an insurers [sic] legal argument should be reserved for extreme cases. The right of an insurer to deny a claim on any arguable legal issue is to be as zealously guarded as is its right to decline benefits on any debatable issue of fact, the test of reasonableness being the same.

*Shelter Mut. Ins. Co. v. Barton*, 822 So. 2d 1149, 1154 (Ala. 2001) (internal citations and quotation marks omitted). In other words, Plaintiff must show that he is entitled to a directed verdict on the breach of contract claim in order to have the claim of bad submitted to a jury. *Employees' Benefit Ass'n v. Grissett*, 732 So. 2d 968, 976 (Ala. 1998). "Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the [normal bad-faith] claim must fail and should not be submitted to the jury." *Nat'l Sav. Life Inc. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982).

*Pyun v. Paul Revere Life Insurance Co.*, 768 F. Supp. 2d 1157, 1169-70 (N.D. Ala. 2011) (alterations in original).

Plaintiff has not established that defendant lacked an "arguable reason" for denying his claim.  Prior to his December 11, 2010 accident, plaintiff underwent three spinal surgeries, and suffered from herniated discs, moderate spinal stenosis, "extensive" multilevel degenerative disc disease, chronic neck and back pain, and upper and lower extremity pain.[121]  Further, plaintiff did not seek emergency medical attention immediately after his fall, did not see his primary care physician for almost three weeks after the fall, and did not receive the MRI revealing his disc herniation at C4-5 for more than two months after the fall.[122]  Under those circumstances, defendant had a "debatable reason" for denying the claim.  Accordingly, this court will grant summary judgment on plaintiff's "normal" bad faith claim.

## 2.     "Abnormal" bad faith

In the "normal" bad-faith case, the plaintiff must show the absence of any reasonably legitimate or arguable reason for denial of a claim. [*State Farm Fire & Cas. Co. v.*] *Slade*, 747 So. 2d [293] at 306 [(Ala. 1999)].  In the "abnormal" case, bad faith can consist of:  1) intentional or reckless failure to investigate a claim, 2) intentional or reckless failure

---

[121] *See* doc. no. 15-3 (Deposition of Rick Hudson), at 45-47, 64; doc. no. 15-5 (Records of Dr. Robert Ward); doc. no. 15-6 (Records of Dr. Robert L. Hash); doc. no. 15-7 (Records of Dr. James Matter).

[122] Doc. no. 15-3 (Deposition of Rick Hudson), at 29-36; doc. no. 15-5 (Records of Dr. Robert Ward), at 647; doc. no. 15-7 (Records of Dr. James Matter), at 781.

to properly subject a claim to a cognitive evaluation or review, 3) the manufacture of a debatable reason to deny a claim, or 4) reliance on an ambiguous portion of a policy as a lawful basis for denying a claim.  747 So. 2d at 306-07.

*Singleton v. State Farm Fire & Casualty Co.*, 928 So. 2d 280, 283 (Ala. 2005) (alterations in original).  The "abnormal" bad faith test "dispense[s] with the predicate of a preverdict JML [*i.e.*, judgment as a matter of law] for the plaintiff on the contract claim if the insurer had recklessly or intentionally failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation."  *White v. State Farm Fire & Casualty Co.*, 953 So. 2d 340, 348 (Ala. 2006) (alterations supplied) (quoting *Employees' Benefit Association v. Grissett*, 732 So. 2d 968, 976 (Ala. 1998)).

Plaintiff has not established that the facts of this case fit one of the four categories of "abnormal" bad faith claims.  Plaintiff argues that defendant "failed to properly investigate and evaluate" his disability claim for two reasons.[123]  First, defendant did not wait to receive plaintiff's complete medical records before deciding to pay him based on the reasonable recovery period for his injuries on March 3, 2011.[124]  Second, defendant did not act on Dr. Nye's recommendation that it "obtain an independent medical evaluation by a neurosurgeon concerning the neck [injury]

---

[123] Doc. no. 25 (Response to Motion for Summary Judgment), at 27.
[124] Doc. no. 15-9 (Advisor Opinion & Management Review), at 9.

issue."[125]   As noted above:

> An insurer is liable for 'abnormal' bad faith when it intentionally or recklessly fails investigate a plaintiff's claim or when it intentionally or recklessly fails to properly subject a plaintiff's claim to a cognitive evaluation or review. [*State Farm Fire & Casualty Co. v. Slade*, 747 So. 2d 293, 306-07 (Ala. 1999).]  In taking this position, Plaintiff bears the burden of presenting "sufficient evidence of 'dishonest purpose' or 'breach of known duty, *i.e.*, good faith and fair dealing, through some motive of self-interest or ill will.'"  *Singleton* [*v. State Farm Fire & Casualty Co.*], 928 So. 2d [280,] 287 [(Ala. 2005)] (quoting *Slade*, 747 So. 2d at 303-04) . . . . "[M]ore than bad judgment or negligence is required in a bad-faith action." *Singleton*, 928 So. 2d at 286-87; *see also Pioneer Services, Inc. v. Auto Owners Inc. Co.*, 2007 U.S. Dist. LEXIS 50678, 2007 WL 2059109 (M.D. Ala. 2007).

*Pyun v. Paul Revere Life Insurance Co.*, 768 F. Supp. 2d 1157, 1172 (N.D. Ala. 2011)

(alterations supplied).

Plaintiff first argues that defendant did not await his complete medical records before deciding to pay him based on the reasonable recovery period for his injuries on March 3, 2011.[126]   However, it is undisputed that CHCS Medical Director Dr. John David Nye reassessed plaintiff's disability claim after receiving his updated medical records on July 21, 2011.[127]   Even so, plaintiff's counsel asserts that, "[h]aving declared on March 3, 2011 that it would process Plaintiff's disability claim based on a 'reasonable period of recovery' and that . . . this was only a exacerbation of

---

[125] Doc. no. 27-3 (Claim File), at 144 (alteration supplied); *see also* doc. no. 15-14 (Deposition of Anita Neptune), at 132-33; doc. no. 15-15 (Nov. 10, 2011 Letter), at 203.

[126] Doc. no. 25 (Response to Motion for Summary Judgment), at 27.

[127] Doc. no. 27-3 (Claim File), at 144.

pre-existing conditions, Defendant . . . set out to prove its premature declarations."[128]

The Eleventh Circuit has expressly held that an attorney's argument in a brief "is not evidence." *Bryant v. United States Steel Corp.*, 428 F. App'x. 895, 897 (11th Cir. 2011) (affirming grant of summary judgment) (citing *Skyline Corp. v. National Labor Relations Board*, 613 F.2d 1328, 1337 (5th Cir. 1980)[129]). Accordingly, plaintiff has not presented *evidence* that the reevaluation of his claim after receipt of his updated medical records was tainted by "dishonest purpose" or "breach of known duty" through "some motive of self-interest or ill will." *See Pyun*, 768 F. Supp. 2d at 1172.

Plaintiff further argues that defendant did not act on Dr. Nye's recommendation that it "obtain an independent medical evaluation by a neurosurgeon concerning the neck [injury] issue."[130] However, plaintiff's medical records depicted a twenty-year history of multiple herniated discs, moderate spinal stenosis, "extensive" multilevel degenerative disc disease, chronic neck and back pain, and upper and lower extremity pain.[131] Under those circumstances, defendant's failure to commission an independent

---

[128] Doc. no. 25 (Response to Motion for Summary Judgment), at 27 (alteration supplied).

[129] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[130] Doc. no. 27-3 (Claim File), at 144 (alteration supplied); *see also* doc. no. 15-14 (Deposition of Anita Neptune), at 132-33; doc. no. 15-15 (Nov. 10, 2011 Letter), at 203.

[131] *See* doc. no. 15-5 (Records of Dr. Robert Ward); doc. no. 15-6 (Records of Dr. Robert L. Hash); doc. no. 15-7 (Records of Dr. James Matter).

medical evaluation showed, at worst, bad judgment or negligence, which do not rise to the level of "abnormal" bad faith.  *See Pyun*, 768 F. Supp. 2d at 1172.

For all of those reasons, this court will grant summary judgment on plaintiff's "abnormal" bad faith claim.

## C.    Anticipatory Breach of Contract

Finally, plaintiff asserts an "anticipatory breach of contract or repudiation" claim against defendant for its alleged denial of plaintiff's current *and future* benefits under the Policy.[132]  The Alabama Supreme Court has observed that, "to give rise to an anticipatory breach of contract, the defendant's refusal to perform must have been positive and unconditional." *International Paper Co. v. Madison Oslin, Inc.*, 985 So. 2d 879, 887 (Ala. 2007) (quoting 23 Richard A. Lord, *Williston on Contracts* § 63:45 (4th ed. 2002)).  "Merely because a given act or course of conduct . . . is inconsistent with the contract is not sufficient; it must be inconsistent with the intention to be longer bound by it." *Johnston v. Green Mountain, Inc.*, 623 So. 2d 1116, 1121 (Ala. 1993).

Plaintiff's amended complaint alleges, without elaboration, that "[o]n or about November 10, 2011, the Defendant denied [his] benefits, indicating that the disability benefits, *both current and future*, to which [he] is entitled under his contract with the

---

[132] Doc. no. 8 (Amended Complaint) ¶¶ 23-24.

Defendant would not be payable to him."[133]  Upon review of the November 10, 2011 letter regarding plaintiff's claim, Union Bankers concluded that plaintiff *was entitled* to surgical benefits for the C4-C5 fusion performed by Dr. Ward, and disability benefits for the reasonable recovery period following the surgery, but *was not entitled* to additional benefits for sicknesses excluded from coverage under the policy.[134] Nowhere does the November 10, 2011 letter state that defendant would not consider plaintiff's future disability benefits claims under the Policy.

Plaintiff quotes *Congress Life Insurance Co. v. Barstow*, 799 So. 2d 931, 938 (Ala. 2001), for the proposition that "[a] repudiation is a manifestation by one party to the other that the first cannot or will not perform at least some of his obligations under the contract."[135]  Plaintiff also contends that, "[a]s a general rule, an anticipatory repudiation gives the injured party an immediate claim to damages for total breach, in addition to discharging his remaining duties of performance."[136]  However, the Alabama Supreme Court held in *Congress* that the insurer repudiated the insurance contract by conditioning its performance on the insured's consent to a modification of the contract.  *Id.* at 938.  The Court did *not* hold that the mere denial of a claim rises

---

[133] *Id.* ¶ 23 (alteration and emphasis supplied).

[134] Doc. no. 15-15 (Nov. 10, 2011 Letter), at 203.

[135] Doc. no. 25 (Response to Motion for Summary Judgment), at 29 (emphasis in original) (alteration supplied).

[136] *Id.* (alteration supplied) (quoting *Congress*, 799 So. 2d at 938).

to the level of an anticipatory repudiation of the insurance contract.

Plaintiff further argues that, "[i]n cases where the insurer has repudiated the Policy, an insured is entitled to recover future benefits from his disability insurer."[137] Plaintiff relies on one unpublished case from the Ninth Circuit, and two cases from state courts in California and Wisconsin, respectively. *See Greenberg v. Paul Revere Life Insurance, Co.*, 2004 WL 74630 (9th Cir. 2004); *DeChant v. Monarch Life Insurance Co.*, 554 N.W.2d 225 (Wis. Ct. App. 1996); *Egan v. Mutual of Omaha Insurance Co.*, 620 P.2d 141 (Cal. 1979). However, unlike the plaintiff in this case, the plaintiffs in the cases cited above successfully showed the existence of bad faith. Accordingly, this court will grant summary judgment on plaintiff's anticipatory breach of contract claim.

## V. CONCLUSION

For the reasons explained above, summary judgment is GRANTED on plaintiff's claims for bad faith and anticipatory breach of contract, and DENIED on his claim for breach of contract. Plaintiff's motion to strike is DENIED.

DONE this 20th day of June, 2013.

_United States District Judge_

---

[137] *Id.* at 29 (alteration supplied).

38